United States District Court
District of Massachusetts

```
                                   )
UNITED STATES OF AMERICA, ex       )
rel. CHRISTOPHER R. GOBBLE,        )
         Plaintiff,                )
                                   )    Civil Action No.
         v.                        )    03-10395-NMG
                                   )
FOREST LABORATORIES, INC. and      )
FOREST PHARMACEUTICALS, INC.,      )
         Defendants.               )
                                   )
```

## MEMORANDUM & ORDER

GORTON, J.

Plaintiff and qui tam relator Christopher Gobble ("Gobble")
brings a personal claim for retaliatory termination against
defendants Forest Laboratories, Inc. ("Forest Labs") and Forest
Pharmaceuticals, Inc. ("Forest Pharmaceuticals") (together,
"Forest") pursuant to the False Claims Act ("FCA"), 31 U.S.C. §
3730(h). Before the Court is Forest's motion to dismiss that
claim.

## I.    Factual Background

The following allegations (which, for the purpose of this
motion to dismiss, are taken as true) are from Gobble's fourth
amended complaint. Gobble was a sales representative for Forest
Pharmaceuticals from October, 2001 through June, 2002. During
his employment, Gobble observed and subsequently complained to
supervisors about two categories of improper conduct: 1) illegal

-1-

kickbacks (i.e., paying doctors for no other reason than to induce them to prescribe Celexa and Lexapro) and 2) off-label promotions of those drugs for use in children and adolescents. Gobble contends that this conduct violated the FCA and caused medical providers to submit false or fraudulent claims to government health insurance programs.

During his employment, Gobble worked closely with Stephen Jones ("Jones"), a senior sales representative, and Jason Richardson ("Richardson"), the Forest Pharmaceuticals Divisional Manager, both of whom, he claims, engaged in various wrongful acts. With respect to kickbacks, Gobble alleges that, inter alia, 1) Jones regularly paid speaker fees and other sums to doctors who prescribed a high volume of Celexa but performed no services for the fees and 2) Jones and Richardson routinely provided expensive meals, golf outings and other gifts for doctors and influential non-physicians to induce prescriptions for the subject drugs.

With respect to off-label promotions, Gobble claims that certain pediatric psychiatrists were targeted. At a December, 2001, sales meeting, for example, Forest allegedly provided sales representatives with a European study implying that Celexa should be prescribed for adolescents and told sales staff to use the study to promote the drug but never to leave any copies behind with doctors. Several pediatric psychiatrists were included on

-2-

Gobble's "call panel".

Gobble contends that he was concerned about the perceived illegal conduct and thus inquired of his supervisors about it. In April and May, 2002, for instance, he claims that he told Richardson that Jones was paying doctors despite the fact that no services were being performed and that such actions constituted illegal kickbacks and inducements. Gobble also told another divisional manager, Jake Beale ("Beale"), about the kickbacks and discussed his concerns with another sales representative, Sally Grigsby ("Grigsby"), who confirmed Jones's kickback practices. Gobble then asked Grigsby to report what she had seen to Beale.

Regarding off-label promotions, Gobble claims that, during a car ride with Richardson, he "questioned" why pediatricians should be on his call list given that Celexa had no adolescent indications. He was concerned about the fact that representatives were encouraged to refer to the European study but not to leave any copies. Gobble states that he subsequently reiterated his concerns to Jones and Richardson but that, in general, his complaints were shrugged off.

In June, 2002, Gobble was fired for 1) submitting a false expense voucher and 2) purchasing gifts for a doctor with whom he had cancelled a golf outing. Although Gobble acknowledges that his actions were improper, he contends that Jones and Richardson advised him to do both, thereby setting him up to be fired

-3-

pretextually instead of in retaliation for reporting improper practices. After he was fired, Gobble contacted Forest about conducting a full investigation of his allegations and the grounds for which he was discharged. Forest's response was, according to Gobble, unsatisfactory and he has allegedly suffered numerous personal and professional setbacks since he was terminated.

## II. Procedural History

Gobble filed his complaint in this qui tam action in March, 2003. The action was initially assigned to Chief Judge William Young before being reassigned to this session in June, 2004. After numerous continuances, the federal government filed a notice of intervention in November, 2008, and a complaint in February, 2009. Later that year, the parties notified the Court that they had reached a settlement and the Court entered a settlement order of dismissal in September, 2009. While the parties have attempted to work out the complicated details of the settlement, the Court has extended its order several times.

In the meantime, Gobble informed the Court that his individual claims against Forest are not covered by the qui tam settlement and that he intends to proceed accordingly. A scheduling order was entered in December, 2009. The following month, Gobble filed his fourth amended complaint and, in February, 2010, the defendants filed a motion to dismiss Count IV

-4-

of that complaint. Gobble has opposed their motion and the
defendants have submitted a reply.

In March, 2010, at a status conference convened to discuss
the qui tam settlements, the Court invited oral argument on the
pending motion to dismiss but neither party was prepared to go
forward. As a result, the Court interposed questions to counsel
and allowed the parties to file short supplemental memoranda in
response thereto.

## III. Analysis

### A.   Motion to Dismiss Standard

To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to "state a claim to
relief that is plausible on its face." Bell Atlantic Corp. v.
Twombly, 550 U.S. 544, 570 (2007). In considering the merits of
a motion to dismiss, the Court may look only to the facts alleged
in the pleadings, documents attached as exhibits or incorporated
by reference in the complaint and matters of which judicial
notice can be taken. Nollet v. Justices of the Trial Court of
Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000) aff'd, 248 F.3d
1127 (1st Cir. 2000). Furthermore, the Court must accept all
factual allegations in the complaint as true and draw all
reasonable inferences in the plaintiff's favor. Langadinos v.
American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). If the
facts in the complaint are sufficient to state a cause of action,

a motion to dismiss the complaint must be denied.  See Nollet, 83

F. Supp. 2d at 208.

## B.   Gobble's Retaliation Claim

Section 3730(h) of the FCA provides that

> Any employee ... shall be entitled to all relief
> necessary to make that employee ... whole, if that
> employee ... is discharged, demoted, suspended,
> threatened, harassed, or in any other manner
> discriminated against in the terms and conditions of
> employment because of lawful acts done by the employee
> ... on behalf of the employee ... [or] others in
> furtherance of other efforts to stop 1 or more violations
> of this subchapter.

31 U.S.C. § 3730(h)(1).  To establish a prima facie claim for

retaliatory termination under the FCA, therefore, a plaintiff

must show that 1) he engaged in "protected conduct", 2) the

employer knew that the employee was engaged in such conduct and

3) the employee was discharged "because of" that protected

conduct.  United States ex rel. Karvelas v. Melrose-Wakefield

Hosp., 360 F.3d 220, 235 (1st Cir. 2004).

Defendants contend that Gobble's complaint does not state a

claim with respect to all three prongs.  Each is considered in

turn.

### 1.   Protected Conduct

"Protected conduct" is to be interpreted broadly and the

First Circuit defines it to mean

> activities that reasonably could lead to an FCA suit[,]
> in other words, investigations, inquiries, testimonies or
> other activities that concern the employer's knowing
> submission of false or fraudulent claims for payment to

-6-

the government.

Id. at 237. A plaintiff, however, need not have known that his actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct. Id.

Here, defendants argue that engaging in protected conduct requires action "in furtherance of" an FCA suit and that Gobble alleges no such conduct. They say that is because 1) complaining to a supervisor is not protected conduct unless accompanied by concrete steps (not taken by Gobble) involved in prosecuting or assisting a qui tam suit and 2) the substance of plaintiff's complaints was not about fraud on (or the knowing submission of false claims to) the government but rather reporting non-compliance with the laws applicable to selling pharmaceuticals, which is a critical difference.

Gobble responds by focusing on the broad language of Karvelas. He retorts that an employee need not use magic words like "false claims" but need only show that the conduct about which the employee is complaining is capable of supporting an FCA claim. He alleges that kickbacks and off-label promotions are both subject to FCA liability and, therefore, his conduct in investigating and inquiring about such actions was protected.

Defendants reply that Gobble incorrectly interprets the law. They insist that the relevant question is not whether the

plaintiff was complaining about events that could be a predicate

for an FCA claim but whether the plaintiff was engaged in

protected conduct (i.e., conduct aimed at exposing government

fraud) at the time of the alleged retaliation. They maintain

that, notwithstanding any viability in Gobble's post-hoc theory

that Forest was violating the FCA with kickbacks and off-label

promotions, his actions while employed by Forest must be capable

of reasonably being characterized as aimed at exposing fraud on

the government and he cannot make that showing.

     In their supplemental memoranda, the parties proffer similar

arguments.  Gobble contends that, unlike other circuits, the

First Circuit does not consider the relator's subjective intent

and only requires that, objectively, the subject matter of the

relator's complaints could reasonably lead to an FCA case.

Because kickbacks and off-label promotions can form the basis for

an FCA action, Gobble's conduct was purportedly protected.

     Defendants respond that, although they agree that subjective

intent is not determinative and that an employee need not know

that an FCA claim exists, the employee's conduct "must,

objectively, be focused on or directed or aimed at exposing fraud

against the government".  Here, they argue that Gobble does not

meet that test because 1) his conduct involved only internal

complaints about regulatory non-compliance and not an

investigation or inquiry and 2) the subject matter of Gobble's

-8-

complaints did not concern the employer's knowing submission of
false or fraudulent claims for payment to the government.
Moreover, they insist that "protected conduct" does not
automatically include any conduct that is capable of ultimately
leading to an FCA claim.

Both positions have been thoroughly delineated.  On the one
hand, Gobble correctly argues that the language in Karvelas is
broad and his allegations can be fairly construed to allege
inquiries that reasonably could (and did) lead to an FCA suit.
On the other hand, Forest reasonably responds that being
retaliated against for investigating or inquiring about an FCA
violation requires some connection between the inquiries and
fraud on the government.  The fact that an employee might believe
that he was fired for being a good corporate citizen and rooting
out illegal conduct does not necessarily imply that he was fired
for conduct taken in furtherance of efforts to avoid FCA
violations.

The Court finds that, on balance, the defendants have failed
to meet their considerable burden of proof in seeking the
dismissal of Gobble's claim at this stage of the litigation.
First, the definition of protected conduct in this Circuit is
objective and broad and, as stated, can be read to incorporate
Gobble's allegations.  Cases from other circuits which do not
employ the same test but rather utilize a standard that considers

-9-

the subjective belief or intent of the relator or require more affirmative action on his part are inapposite.  E.g., Fanslow v. Chicago Mfg. Ctr., Inc., 384 F.3d 469, 479-80 (7th Cir. 2004). See also Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 914 (4th Cir. 1997) (finding no protected conduct and criticizing plaintiff for "never inform[ing] anyone that he was pursuing a qui tam action").

Second, the Court's reading of Karvelas differs from the defendants'.  It does not hold (as defendants contend) that an employee's subject conduct "must, objectively, be focused on or directed or aimed at exposing fraud against the government".  To be sure, Gobble's complaint does not explicitly tie his retaliation claim to fraud on the government but the complaint does generally describe how his inquiries support an FCA claim. Drawing all inferences in his favor and reading those allegations together with the retaliation claim, the Court finds that Gobble has alleged enough to survive a motion to dismiss.

Nor is the Court persuaded by the argument that Gobble merely complained about regulatory violations and that, under Karvelas and other cases, such inquiries cannot support a retaliation claim.  In Karvelas, the Court held that the alleged regulatory violations about which the relator had inquired were not, without more, themselves actionable under the FCA.  360 F.3d at 234-35.  See also United States ex rel. Hopper v. Anton, 91

-10-

F.3d 1261 (9th Cir. 1996). In that case, it logically followed
that investigating conduct which is not actionable under the FCA
could not reasonably lead to an FCA suit. Karvelas, 360 F.3d at
237 ("[C]orrecting regulatory problems ... is not actionable
under the FCA in the absence of actual fraudulent conduct.")
(citation and quotation marks omitted). Here, by contrast,
Gobble claims that his inquiries concerned conduct that was
actionable under the FCA and thus his activities reasonably could
have led (and did lead) to a viable FCA action.

Defendants' position also seems to ask too much of
whistleblower plaintiffs, especially on a motion to dismiss.
While Gobble did not connect all of the dots between alleged
illegal kickbacks and off-label promotions and fraud on the
government during his employment as a new sales representative at
Forest or understand that the subject improprieties implicated
such fraud (or include a statement to that effect in his
complaint), the complaint is not therefore dismissible.

### 2. Knowledge

The second requirement for a valid FCA retaliation claim is
that the employer knew that the employee was engaged in protected
conduct. The defendants' requisite awareness "mirrors the kind
of protected activity in which an employee must be engaged".
Karvelas, 360 F.3d at 238 (citation and quotation marks omitted).

The Court is convinced that Gobble has adequately pled that

-11-

the defendants were on notice of and knew about his protected
conduct. His complaint contains several allegations of
complaints and inquiries to his supervisors about the allegedly
unlawful kickbacks and off-label promotions. Indeed, as Gobble's
counsel stated at oral argument, it is reasonable to infer that
Forest was in a position of superior knowledge and knew or should
have known that the improprieties about which Gobble inquired
concerned possible FCA violations.

Thus, although Gobble did not, at the time, tell his
supervisors that he was inquiring about fraud on the government,
because the Court has found that he has adequately stated a claim
of protected conduct, it also finds that the employer knew (or
should have known) that he was engaged in such conduct.

### 3. Causation

Defendants also contend that Gobble cannot show that he was
fired "because of" his protected conduct. In particular, they
call his claims of pretext conclusory and speculative and
maintain that Gobble can show only that he was fired shortly
after complaining. Moreover, defendants assert that his argument
is "patently implausible" because he admits that he was fired for
wrongful conduct of false expense reports and purchasing gifts
for a doctor.

Gobble responds that the timing of his firing and its nexus
to his engagement in protected activity is sufficient at this

stage to infer that he was fired for retaliatory reasons.  He also alleges that he had received favorable evaluations and salary increases prior to his complaints which further support the conclusion that he was impermissibly fired.

Gobble has the better argument.  His complaint alleges, with extensive and colorable support, that he was fired in retaliation for his conduct and that the stated reasons were pretexual.  That is enough to survive a motion to dismiss.

## C.  Dismissal of Forest Labs

Forest also contends that Gobble's complaint contains no basis for holding Forest Labs liable apart from the fact that it is the parent company of Forest Pharmaceuticals (for whom Gobble worked).  Defendants argue that the retaliation claim cannot proceed against Forest Labs absent a valid veil-piercing theory which Gobble does not allege.  Gobble responds that his complaint alleges sufficient contacts with Forest Labs including that 1) it was responsible for relevant ethics guidelines and 2) two Forest Labs employees were involved in his firing.

The Court will not dismiss the claim against Forest Labs at this stage.

**ORDER**

In accordance with the foregoing, defendants' motion to dismiss (Docket No. 90) is **DENIED.**

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated July 23, 2010

-14-